No. 26,468.

ALLIE ARIETT, Administratrix of the Estate of DOMINICO ARIETT, Deceased, *Appellant*, v. THE OSAGE COUNTY BANK, VICTOR CHIRI, a Minor, and J. E. JONES, as Guardian, etc., *Appellees*.

### SYLLABUS BY THE COURT.

GIFT—*Inter Vivos—Delivery—Necessity and Sufficiency*. The proceedings considered in an action to determine ownership of liberty bonds, and *held*, a gift *inter vivos* was not established.

Appeal from Osage district court; ROBERT C. HEIZER, judge. Opinion filed February 6, 1926. Reversed.

*Ralph T. O'Neil, J. D. M. Hamilton* and *Barton E. Griffith*, all of Topeka, for the appellant.

*A. K. Stavely,* of Lyndon, and *Charles S. Briggs,* of Topeka, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The appeal was taken from a judgment of the district court holding that certain transactions effected a gift *inter vivos* of liberty bonds.

At the time of his death on October 28, 1919, Dominico Ariett had registered liberty bonds to the amount of $2,500 at the Osage County Bank. After his death his administratrix brought suit to obtain possession of the bonds. The bank answered it had no interest in the bonds, and was ready to deliver them as the court might direct. Victor Chiri, minor son of Bertha Chiri, now Bertha Romersa, was made a party to the action, and claimed the bonds. The court returned the following finding of fact:

"2. That on the 8th day of October, 1918, said Dominico Ariett and Bertha Chiri went together to the Osage County Bank in Osage City, Kan., and Ariett made arrangements with an officer of said bank for the purchase of the bonds involved in this suit. That said Ariett stated to said officer of said bank that it was his desire and intention to so arrange the purchase of said bonds that he, Dominico Ariett, should have the use and income from said bonds as long as he lived, and that at his death they should be the property of Victor Chiri. That said officer of said bank informed him that the proper way to handle it was for the bonds to be issued in the name of said Dominico Ariett, and that when they were received from the treasury department, Ariett could make an assignment to said Victor Chiri, but not have the transfer upon the books of the treasury department, and that by this means the

Gifts, 28 C. J. pp. 642 n. 68, 649 n. 55, 658 n. 71, 676 n. 33.

interest check should come to said Dominico Ariett until his death, and that after his death said Victor Chiri could have the transfer made at the treasury department, and that he would then be the absolute owner of said bonds. That Dominico Ariett agreed to this plan."

The court further found that, on April 12, 1919, Ariett went to the bank and executed and acknowledged assignments of the bonds to Victor; the assignments were indorsed on the bonds, and authorized transfer on the books of the treasury department; after execution of the assignments, the bonds were left with an officer of the bank, and they were kept with the papers of the bank, and not in any private box of Ariett in the bank. The conclusion of law was, Ariett made a gift of the bonds to Victor Chiri, and title passed on April 12, 1919, subject only to Ariett's use and benefit of the bonds during his lifetime. Plaintiff requested the court to find certain facts not included in the finding returned, and challenged correctness of the court's findings. The court's findings are not quite correct, are not quite complete, and do not state just what occurred in the manner it occurred. There is no conflict in the evidence relating to the controlling facts, which may be stated as follows:

In October, 1918, Ariett had a conversation with Victor's mother, in which he said they had been after him to buy liberty bonds; he had some money he had collected, and would put it in liberty bonds; he would buy them so he would get the interest as long as he lived, and when he died they would go to the boy, so if the boy wanted an education he would have the money. A week or two subsequent to this conversation, Ariett and Victor's mother were in Osage City, and Ariett asked her to go to the bank with him; he was going to buy liberty bonds, and he wanted her to go along to spell the name correctly. They went to the Osage County Bank, and had a conversation with its vice president, Womer, with whom Ariett had done business for many years. Victor's mother states part of what occurred as follows:

"Mr. Ariett said he would like to buy some bonds; that he would like to buy them so he would get the interest himself as long as he lived, and that he wanted the principal and interest to go to Victor Chiri when he died. He asked if he could fix them that way. Mr. Womer said he had some forms that he would get and show him, and he went into the back part of the bank and got them. He said, 'Here is an assignment on the back; you can draw the interest as long as you live, and when you die the principal and interest will go to Victor Chiri.'"

The bank had unregistered coupon bonds for sale. Ariett had

$2,500 in currency with him. He gave the money to Womer, and received a "duplicate slip," which Victor's mother said was a "receipt until the bonds came." Womer took out of the bank's bond box three coupon bonds amounting to $2,500, and sent them to Washington to be exchanged for registered bonds. Ariett said he wanted them registered in his own name, and they were registered in his name, the same as any purchaser would have a bond registered. Womer's recollection of details of the transaction was indistinct, because it occurred so long before the trial. He recalled the bonds were to be registered in the name of Dominico Ariett, so he would have the right to the interest earned during his lifetime, but did not recall that they were to be assigned to Victor, or were to be given to any one at Ariett's death. Ariett was to be notified when the registered bonds arrived, and he was notified by letter that the bank had received them.

The bank kept a bond account, and on January 7, 1919, the cashier signed Ariett's name to a check for $2,500, and made the proper bookkeeping notations. The cashier testified he delivered the bonds to Ariett, but he said his only recollection bearing on delivery was the check he signed marked "Dominico Ariett, registered bonds, $2,500," and the custom of the bank to turn over bonds to customers. No conversation about the bonds occurred at that time, and the evidence does not show whether Ariett took them away with him.

Probably eighty per cent of the customers of the bank left their bonds at the bank for safe-keeping. The bank had a customers' bond box, which was kept in the bank's safe, and customers' bonds were kept in the box. Such bonds were covered by burglary insurance, and no one had access to them except persons in the bank. A customer owning bonds and desiring to take them for any purpose, applied to some one in the bank, who got them for the customer. Ariett had no safety deposit box of his own in the bank, and if the bonds he purchased were in the bank from January 7 to April 12, 1919, they were in the customers' bond box.

On April 12 Ariett went to the bank, and said he wanted to assign the bonds, and he wanted it fixed so he would have the interest on them during his lifetime. There is no evidence Ariett brought the bonds into the bank with him. The cashier told him he could make an assignment and retain the bonds, and not record the assignment; and as long as the assignment was not recorded at Wash-

Ariett v. Osage County Bank.

ington, the interest checks would come to him, and the treasury department would have no knowledge of the transfer. The assignment was made in that way, in response to Ariett's request. The cashier's testimony is the only testimony regarding what occurred when the assignment was made. In addition to what has been stated, he testified as follows:

*Direct Examination:*

"Q. You kept the bonds at the bank? A. Yes, I think so; we had practically all of the bonds; the customers left them with us for safe-keeping; we had a safe there that we kept them in.

"Q. Why did you keep them there? A. We kept them in the bond box for customers.

"Q. To refresh your recollection, was there anything said about sending these bonds to Washington for the assignment record? A. No; it was the opposite. They were not to be sent for the reason that he wanted the interest on them during his lifetime; if they had been sent, the assignment would have been on the government records in the name of the assignee, and the interest would have come to him.

"Q. It was stated they were not to be sent in; is that correct? A. Yes, sir."

*Cross-examination:*

"Q. You said, I believe, that when he made the transfer of the bonds there was nothing said about what was to be done with the bonds? A. Yes; they were not to be registered in Washington; that is, the assignment was not to be registered.

"Q. What was to be done with the bonds themselves? A. He was to hold them; they were to be kept there, and the assignment not to be registered in Washington, so that he would get the interest.

"Q. Did he say anything about what was to be done with them afterward? A. No, sir."

*Redirect Examination:*

"Q. The bonds were put back in the general box where all customers' bonds were kept? A. If I remember right, they were.

"Q. He did not tell you to deliver them to anybody else? A. No, sir."

Victor's mother testified that after the bonds were assigned Ariett said he had been to the bank and had seen to the bonds. He did not say he had assigned them, and he said nothing about any change in them. Ariett received the first interest installments.

A witness testified he met Ariett in town on a date the witness could not fix, and Ariett said he had just come from the bank, where he had deposited $2,500 for the Chiri boy, and it was his intention to have the bonds in the boy's name, and draw the interest himself,

and when he died, to leave them to the boy. Testifying further, the witness said:

"Q. He said he was going to give them to the boy after his death; is that right? A. Yes.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Just what language did this man use about the bonds? A. He says, 'I came over from depositing $2,500; I bought $2,500 worth of liberty bonds for the boy; when I am dead they will be to him.'"

All the evidence which would be helpful in any degree in determining the issue raised by the guardian's answer, has been recited. The finding of the court that the bonds were kept in the papers of the bank was incorrect. The only evidence on the subject was that they were kept with bonds of other customers, in the customers' bond box. Such bonds were held for safe-keeping only, and were available to owners on their application. The court ought to have found, as plaintiff requested, that Ariett did not deliver the bonds to Victor, or to any one acting for Victor, and gave no instructions to the bank relative to delivery of the bonds.

The precise circumstances under which the bonds got into the bank's custody were these: Having money to invest, and yielding to solicitation, Ariett concluded to purchase liberty bonds. He desired to arrange it so he could have the income from them as long as he lived, and at his death they would become the property of Victor. The vice president of the bank suggested an assignment according to forms shown Ariett, whereby Ariett could draw the interest as long as he lived, and when he died the principal and interest would go to Victor. With this understanding, coupon bonds were purchased, the bank forwarded them for registered bonds, and bonds registered in Ariett's name came back to the bank. When Ariett came into the bank to make the assignment, the original purpose was adhered to. The assignment was made, but a step which would make the assignment presently effective to vest title in Victor, was not to be taken: The assignment was not to be registered. The assignment having been made upon this condition, the bonds were put back in the customers' bond box.

Victor himself was not to get the bonds themselves, or any benefit from them, until after Ariett died, and the direct evidence relating to the capacity in which the bank held the bonds after the assignment was executed, established the fact that the bank was custodian for Ariett. The cashier testified Ariett was to retain the

bonds; Ariett was to hold them, and the bank had no authority from him respecting delivery. Disregarding this evidence, the assignments were not to be registered because registration would be equivalent to delivery of the bonds to Victor; and the testimony of the officers of the bank who transacted all the business with Ariett relating to the bonds, is barren of any talk even hinting at delivery of the bonds to the bank to be held as the property of Victor during Ariett's lifetime, and at his death to be delivered to Victor. There was no evidence that Ariett said anything or did anything manifesting any specific intention relating to custody or delivery of the bonds, beyond leaving them where they were; and the bank treated the bonds in the same way it treated other customers' bonds. The result is, there is no basis for a finding of fact that the transaction involving assignment of the bonds constituted the bank custodian for Victor.

It is beyond controversy that Ariett had no intention to make a gift presently effective to transfer title to Victor, when the bonds were purchased, when registered bonds were received, or when the assignments were placed on the back of the bonds. His intention was to fix it so Victor would get the bonds when he died. To effectuate that intention, he performed just one act: He executed and acknowledged an assignment to Victor, indorsed on each bond. Neither intention nor objective manifestation went further.

Gifts may be made to be enjoyed by the donee after the donor's death. The gift itself must, however, be complete in the donor's lifetime. Title must pass from the donor to the donee. In the case of bonds, transfer of title may be effected by delivery of the bonds to the donee, or by executing and delivering to the donee an assignment of the bonds. In the latter case, delivery of the assignment takes place of delivery of the bonds. Delivery of the bonds or of the assignment may be to a third person for the donee, but dominion of the donor must be as effectually relinquished as if delivery had been directly to the donee. The requirement of delivery may also be satisfied by the donor creating himself trustee of the bonds for benefit of the donee. In that event, the creative manifestation, whether by word of mouth, by writing, or by other conduct, must be intentional, unequivocal, and unmistakable. In all of these cases, the donor must make the gift. No matter how clear his intention, or how strong his desire, if what he does falls short of divesting himself of present title, he has made no gift, and neither law nor equity can

aid him or aid the donee. The soundness of these principles is recognized by all the authorities. There is conflict between some of the decisions professing to apply the principles. Each decision must be judged in the light of the peculiar facts on which it was based, and it is not necessary to review the cases here. The principal decisions of this court are collated in the brief for plaintiff as follows: *Whitford v. Horn,* 18 Kan. 455; *Johnson v. Eaton,* 51 Kan. 708, 33 Pac. 597; *Gallagher v. Donahy,* 65 Kan. 341, 69 Pac. 330; *Calvin v. Free,* 66 Kan. 466, 71 Pac. 823; *Rogers v. Richards,* 67 Kan. 706, 74 Pac. 255; *Bruce v. Squires,* 68 Kan. 199, 74 Pac. 1102; *Hall v. Hall,* 76 Kan. 806, 93 Pac. 177; *Barnhouse v. Dewey,* 83 Kan. 12, 109 Pac. 1081; *Hess v. Hartwig,* 83 Kan. 592, 112 Pac. 99; *Smith v. Smith,* 84 Kan. 242, 114 Pac. 245; *Pohl v. Fulton,* 86 Kan. 14, 119 Pac. 716; *Wood v. Bank,* 91 Kan. 522, 138 Pac. 412; *Lyman v. Goll,* 111 Kan. 530, 207 Pac. 817.

In this instance Ariett did nothing whatever to constitute himself trustee of the bonds for benefit of Victor. He chose to accomplish his purpose by the method of assignment and, as indicated, no court has power to erect a trusteeship on an ineffectual assignment. The donor must appoint the trustee. The assignment had no effect to pass title when it was made, and was not intended to have any such effect. The passing of title by the assignment during Ariett's lifetime was considered to this extent and no further: The only method which the government would recognize, registration of the assignment, was rejected. The supposition was that the assignment, without more, would be effectual to pass title after the assignor's death. Such is not the law, and the intended gift failed.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for plaintiff.