No. 26,762.

IRA J. McCOY, Administrator, etc., *Appellee,* v. THE SHAWNEE BUILDING AND LOAN ASSOCIATION et al., *Defendants* (ANNA IRVINE, *Appellant*).

SYLLABUS BY THE COURT.

1. GIFTS—*Causa Mortis*—*Sufficiency of Evidence.* In an action to recover on certificates of stock in a building and loan association, the evidence to support a claim of title thereto by gift *causa mortis* considered and held sufficient as against a demurrer thereto.

2. SAME — *Causa Mortis* — *Revocation* — *Birth of Child.* A gift *causa mortis* is not revoked by the birth of a child after the gift had been made and before the death of the donor.

Appeal from Shawnee district court, division No. 3; OTIS E. HUNGATE, judge. Opinion filed December 11, 1926. Reversed.

*Benjamin F. Endres,* of Leavenworth, for the appellant.

*James Haley,* of Sabetha, and *R. F. Hayden,* of Topeka, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff sued the Shawnee Building and Loan Association to recover $2,000 on certificates of stock that had been issued by that association to Margaret J. McCoy, deceased, during her lifetime. On the application of the Shawnee Building and Loan Association, Mrs. Anna Irvine, Miss Eileen Irvine, and James Irvine were made parties to the action. Eileen Irvine and James Irvine filed disclaimers. Anna Irvine filed an answer and cross petition in which she claimed that the stock in question had been delivered by Margaret J. McCoy, the daughter of Anna Irvine, to Alice Shear, as a gift to Anna Irvine to be delivered to her after the death of Margaret J. McCoy, who was then ill and pregnant, and who believed that she would not survive her illness and the birth of her child. The plaintiff denied the allegations of the answer and cross petition. A jury was impaneled, and evidence was introduced on behalf of Anna Irvine to establish the allegations of her answer and cross petition. At the conclusion of that evidence, the court sustained the plaintiff's demurrer thereto and rendered judgment for the plaintiff against the Shawnee Building and Loan Association for the

Gifts, 28 C. J. pp. 684 n. 61, 686 n. 71, 697 n. 15, 698 n. 24, 704 n. 17, 706 n. 51; 12 R. C. L. 969.

McCoy v. Shawnee Building & Loan Ass'n.

sum of $2,000, which had been paid into court by that association to be paid over to whomsoever should prevail in the action. Anna Irvine appeals.

1. Did the court commit error in sustaining the demurrer to the evidence of Anna Irvine? There was evidence which tended to prove that prior to her marriage to Ira J. McCoy, which took place in December, 1921, Margaret J. McCoy had been employed as a stenographer to the commandant at Fort Leavenworth; that at the time of her marriage she was tired and in a run-down condition, brought about by overwork; that after her marriage, she gradually grew worse, suffered from auto-intoxication, and became pregnant, after which she continued to fail in health and often expressed her opinion that she would not survive her illness and the birth of her child; that under these circumstances, she placed the certificates of stock in controversy in this action, together with some other personal property, in the hands of Alice Shear to be by her turned over to Anna Irvine after the death of Margaret J. McCoy; that she gave birth to her child on February 20, 1923; and that on March 2, 1923, she died from an obstruction of the bowels caused by puerperal sepsis. We quote from the abstract evidence to show the terms under which the certificates of stock were placed in the hands of Alice Shear. Eileen Irvine, a daughter of Anna Irvine and a sister of Margaret J. McCoy, testified:

"I saw my sister in June, 1922; mother and I went out there together; I remained a couple of days, but mother stayed there a week or two; Margaret appeared to me then to be in a terrible run-down condition. Margaret said—my sister said, 'I don't know—I just feel terrible.' She said, 'I don't feel like I am going to get better.' She said, 'Mother, I have taken care of you, Alice Shear—.' Margaret's general appearance to me was poorly. She said, 'I don't think I am going to get better, I feel terrible'; she says, 'I have taken care of you, mother.' She says, 'Mother, I have taken care of you. Alice Shear will give you my papers, the building and loan shares in Leavenworth and the Shawnee Building and Loan shares at Topeka, and that oil stock, if anything happens to me.' After my sister died I went to Alice Shear and asked her for the papers and she said, 'Yes, I have them—' . . . 'Mother, I want you to get what I have, and you go to Alice Shear and she will give you my papers,' and she designated the building and loan stock at Leavenworth and at Topeka, and the oil stock. All of the papers that you (Mr. Endres) are handing me—the stock certificate that has been introduced in evidence, were handed to me by Alice Shear about a week after my sister's death and I gave them to my mother; the book indorsed 'Installment Stock Book Certificate number 1436—5 shares'; in the Citizens' Mutual Building and Loan Association in account

with Margaret J. McCoy, was in the package of papers handed to me by Alice Shear after the death of my sister. . . . I next saw my sister in October, 1922. . . . At that time she said to mother and I that she wanted to have these shares, the building and loan shares, turned over to mother in her name; she didn't feel like she was going to get better; she said she wanted to have the shares turned over in mother's name, if anything happened to her; that she wanted mother to get what she had, and we said—it was— it seemed like if I tell the first part I almost—we kept her from doing it. That wasn't all the conversation—and we said that—well, no, to leave it the way it was; then she said Alice Shear will give you those papers in case any-thing happens to me. She wanted us to take them into the building and loan. She said she wanted to take the building and loan stock down to the building and loan and have the name changed, and we said no, to leave it the way it was, and she said, then mother will get it from Alice Shear and we let it go at that in place of taking it to the building and loan association like she wanted it."

John McFarland, an uncle of Margaret J. McCoy and a brother of Anna Irvine, testified:

"I am Margaret McCoy's uncle. I attended her wedding and gave her away in marriage at the Presbyterian church in Leavenworth. . . . I did not see her again until she come home in October at her mother's house. . . . I talked with my niece, Margaret J. McCoy, at her mother's house then. I asked her how she was feeling, and she said, 'I am feeling very bad, in fact haven't felt well for some time. . . . As far as the folks are con-cerned I have done the best I can by them, as I have given to Miss Shear some building and loan association stock,' but I don't think she told me in what company or where or the amounts, and also some oil stock which she said she had turned over to Miss Shear, with instructions to her that in case of her death or anything happening to her, that these instructions [papers] were to be given to my sister, who is her mother, Mrs. Irvine. In this conversation, she stated to me that she didn't believe, I think is the word she used, I don't remember of course the exact conversation, but she was not going to survive this ordeal, and that in case of her death that the papers in question were to be turned over to her mother as she had given this property to her."

Other than as above outlined, there was no evidence to show the terms on which the certificates of stock were placed in the hands of Alice Shear. She did not testify.

In *Calvin v. Free,* 66 Kan. 466, 71 Pac. 823, the court said:

"To constitute a gift *causa mortis,* the gift must be made in contemplation of the near approach of death, to take effect absolutely only upon the death of the donor and before that of the donee. There must be a delivery of the property to the donee or some one for him. Subject to the right of recall in case he does not die, or in case the donee dies first, the donor must part with all dominion over the donated thing.

"To constitute a gift *inter vivos,* there must be a gift absolute and irrevo-cable, taking effect immediately, the donor delivering the property to the donee

or some one for him, and parting with all future dominion over it." (Syl. ¶¶ 1, 2.)

In *Ariett v. Osage County Bank*, 120 Kan. 286, 291, 242 Pac. 1018, the following language was used:

"Gifts may be made to be enjoyed by the donee after the donor's death. The gift itself must, however, be complete in the donor's lifetime. Title must pass from the donor to the donee. In the case of bonds, transfer of title may be effected by delivery of the bonds to the donee, or by executing and delivering to the donee an assignment of the bonds. In the latter case, delivery of the assignment takes place of delivery of the bonds. Delivery of the bonds or of the assignment may be to a third person for the donee, but dominion of the donor must be as effectually relinquished as if delivery had been directly to the donee. The requirement of delivery may also be satisfied by the donor creating himself trustee of the bonds for benefit of the donee. In that event, the creative manifestation, whether by word of mouth, by writing, or by other conduct, must be intentional, unequivocal, and unmistakable. In all of these cases, the donor must make the gift. No matter how clear his intention, or how strong his desire, if what he does falls short of divesting himself of present title, he has made no gift, and neither law nor equity can aid him or aid the donee."

There was evidence which tended to prove a gift *causa mortis*, and that evidence should have been submitted to the jury. It was error to sustain the demurrer thereto.

2. The plaintiff argues that if there had been a gift *causa mortis* by Maragret J. McCoy, it was revoked by the birth of her child. He cites 28 C. J. 698, where the following language is found:

"Where by law a will, whether making a total or partial disposition, is revoked by the subsequent birth of a child, if no provision has been made in the instrument for that contingency, a gift *causa mortis* will likewise be revoked."

To support that statement, Corpus Juris cites *Bloomer v. Bloomer*, 2 Bradf. Surr. (N. Y.) 339. The quoted statement contained in Corpus Juris appears to be based on that decision alone; no other case is cited to support it. This necessitates an examination of section 22-240 of the Revised Statutes, which reads:

"If the testator have no children at the time of excuting his will, but shall afterwards have a child living, or born alive after his death, such will shall be deemed revoked, unless such provision shall have been made for such child by some settlement, or unless such child shall have been provided for in the will, or in such way mentioned therein as to show an intention not to make such provision; and no other evidence to rebut the presumption of revocation shall be received."

That statute specifically concerns wills. Unless a gift *causa mor-*

*tis* can be said to be a will, the statute does not apply thereto. A gift *causa mortis* is not a will because it does not purport to be a will; because it is not executed as required by statute for the execution of wills; and because it takes effect at once subject to the conditions which the law imposes, one of which is that it can be revoked during the lifetime of the donor. The statute prescribes the manner in which a will may be revoked by the testator. When a will is once made, it continues to be the will of the testator until it is revoked in the manner prescribed by statute or by the conditions named in section 22-240. In 28 C. J. 697 it is said:

"A gift *causa mortis* has this distinguishing feature that it is revocable at any time during the life of the donor at his option and without regard to the state of his health."

A large number of cases are cited to support that rule. The same rule is found in 12 R. C. L. 969.

A gift *causa mortis* need not be revoked by the donor in the manner prescribed by statute for the revocation of wills; such a gift may be revoked in other ways. Section 22-240 applies to wills, not to gifts *causa mortis*.

Before she placed it in the hands of Alice Shear, Margaret J. McCoy had absolute control over the property. She could have sold it or she could have given it away, and neither the law nor any other person could interfere with such sale or gift. After the disposition had been made, she knew that she was pregnant but allowed the gift to stand, and by so doing continually confirmed the gift until her death. After the birth of her child, Margaret J. McCoy could have revoked the gift, but she did not do so. If no disposition had been made of the property she could have made a gift thereof *causa mortis* which would have been good notwithstanding the claims of the child.

If the property was a gift *causa mortis* by Margaret J. McCoy, it was not revoked by the birth of her child.

The judgment is reversed, and the cause is remanded to the trial court for further proceedings in accordance with this opinion.

HARVEY, J., dissenting.