## No. 29,270.

HARRY BILLINGS, *Appellant,* v. OLIVER O. BISHOP, *Appellee.*

(286 Pac. 221.)

Opinion filed April 5, 1930.

*W. T. Roche,* of Clay Center, *Edgar Bennett* and *A. C. Bokelman,* both of Washington, for the appellant.

*F. R. Lobaugh,* of Washington, *Charles L. Hunt* and *Frank C. Baldwin,* both of Concordia, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: Plaintiff sued defendant on a claim for $6,000, the nature of which will have to be stated at some length:

The late N. J. Bishop, grandfather of this plaintiff and father of this defendant, was a long-time resident of Washington county. He had a family of four sons and one daughter and had accumulated considerable property. His wife died some years ago, and as he grew old he began to divide his property among his children. One

son, John, had died leaving a widow and three children. The aged father gave John's widow and her three children a quarter section of land. He apportioned other properties to his sons. His daughter, Clara, had also died some years ago, leaving one child, Harry Billings, plaintiff herein. In the last few years of his lifetime N. J. Bishop often declared his intention to give plaintiff what would have been his mother's proportionate share of his estate if she had survived him, and he had frequently said that share would be eighty acres of land or $8,000 in money.

About March 1, 1926, plaintiff, who was living in Ellsworth and operating a meat market there, received a telegram from defendant notifying him of his grandfather's illness. Plaintiff set out immediately for Washington county and on his arrival he found his grandfather in bed. He had a conversation with his grandfather in which the latter stated that he was going to give plaintiff $2,000 at that time and $6,000 later on. The defendant, Oliver O. Bishop, known in the record as "Ollie," came into the room and the grandfather told Ollie the substance of this conversation and "told him [Ollie] to go ahead and pay this $2,000 now." The grandfather said he was going to use the balance of $6,000 in "the business" for a while.

"Q. And what did your grandfather say to Ollie at that time? A. He told him he was going to give me part of my estate right now so I could go ahead and put in groceries. He was going to give me $2,000 of it right now and how to do it; that he was going to write me a check for $200 that he still had in the bank personal money; that he had $800 worth of bonds that he was going to give to me to make a thousand, and for Ollie to give me a check out of the other funds for a thousand dollars; that he was going to use the balance of it in the business for a while, and Ollie said, 'All right. I will do it.'"

Two days later, on March 3, 1926, the grandfather died. After the funeral defendant gave plaintiff his personal check for $1,200, and some three months later the $800 worth of bonds which had belonged to the grandfather were also delivered to him.

As nothing further was forthcoming plaintiff brought this action against his uncle Ollie on the theory that the latter had bound himself to pay an additional $6,000 as the balance of plaintiff's share of his grandfather's estate which had been so often promised to him by the grandfather in his lifetime. It was part of plaintiff's theory that Ollie had possession of sufficient property of the grandfather to pay the $6,000 and that the fair interpretation of the conversation

between the grandfather and Ollie prior to the latter's death was that Ollie acknowledged a trust which he bound himself to discharge, and that he was liable to plaintiff accordingly.

On joinder of issues tendered by plaintiff's petition the cause was tried. Plaintiff's evidence was as set out above, with additions which tended to show that Ollie and his father were extensively engaged in an agricultural partnership of some sort and in stock feeding and the like. It also tended to show that within a few years Ollie had become the title holder of considerable land which belonged partly at least to his father, and that Ollie's apparent personal estate was a good deal larger and his father's estate a good deal less than some members of the family anticipated. Certain other lawsuits or judicial proceedings were instituted more or less designed to get to the bottom of these matters. There was some testimony that Ollie said to one of his brothers that his father's business affairs were so arranged as to be subject to his (Ollie's) discretion. "I have things fixed just the way I want them and it is up to me whether you get a damned cent or not."

At the conclusion of plaintiff's evidence, the trial court sustained a demurrer thereto, and judgment was entered for defendant.

Plaintiff appeals, contending that a completed gift *inter vivos* of $8,000 was established by the conversation between the plaintiff and his grandfather, $2,000 of which was represented by the $800 in bonds and by defendant's check for $1,200, and that the remaining $6,000 was merely left in defendant's hands on the latter's acknowledgment of a trusteeship to that effect and his agreement that he would pay it sometime to the plaintiff. We fail to see anything in plaintiff's evidence to evidence a trust, nor can we discern language or conduct on the part of defendant which tends to show a promise to pay plaintiff $6,000. The fair import of the grandfather's language to Ollie was a direction to him to pay plaintiff $1,000 in cash. And Ollie's response: "All right, I'll do it," signified his readiness to do as he was told. Moreover, the language of the plaintiff's grandfather was expressly to the effect that he did not intend to give plaintiff the entire $8,000 at the time they had their last conversation. The donor's intention was quite the contrary. Of course, he did not then contemplate his speedy dissolution. "He [grandfather] said he was going to use the balance in the business for a while." Presumably that was the partnership business in which the dying man and his son Ollie were ·engaged, but

whatever else the grandfather may have meant, he made it clear that a completed gift of the entire $8,000 was not then intended. And the law of such gifts is simple and all to one effect. To effect a gift *inter vivos* there must be an immediate transfer and delivery of the gift by the donor and its acceptance by the donee. A merely avowed intention to make a gift which is neither preceded nor followed by its actual or constructive delivery and acceptance is ineffective to confer title. (*Gallagher v. Donahy*, 65 Kan. 341, 69 Pac. 330; *Ariett v. Osage County Bank*, 120 Kan. 286, 242 Pac. 1018, and citations; *Saxon v. Linscott*, 123 Kan. 374, 255 Pac. 50.)

On behalf of appellant it is suggested that his claim against his defendant uncle could be supported on the theory of a novation—as if the grandfather had owed the plaintiff $6,000 and that defendant agreed to be substituted as debtor to the plaintiff. But the grandfather was not indebted to plaintiff, consequently the theory of novation is too nebulous for discussion.

The judgment is affirmed.