Lena F. PACE, an Individual, Plaintiff,

v.

The FIRST NATIONAL BANK OF OSAWATOMIE, KANSAS, a Corporation, Defendant,

and

Betty Jane Hartley, as Administratrix of the Estate of Vesta Crayton, Deceased, Intervenor.

Civ. A. No. KC–2171.

United States District Court
D. Kansas.

June 21, 1967.

Albert O. Kiesow, Kansas City, Kan., for plaintiff.

Willard Phillips, McAnany, Van Cleave & Phillips, Kansas City, Kan., for defendant Bank.

Willis McQueary, Osawatomie, Kan., for Administratrix.

## OPINION INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW

THEIS, District Judge.

This case involves the legal disposition of two bank accounts established at the same time and in the same manner, one being a checking account in the amount of $5,000.00, and the other a savings account in the amount of $22,021.70, the proceeds of which were the property of Vesta Crayton, Deceased.

This action arises upon the complaint of the plaintiff against the defendant bank for withholding payment to the plaintiff on the accounts as alleged surviving joint owner. The plaintiff claims that she is a joint tenant in the accounts and under the laws of Kansas is entitled to the proceeds of the accounts. The second count of the complaint purports to set forth a cause of action against the defendant bank for exemplary or punitive damages to the plaintiff in the amount of $25,000.00 for wrongful withholding from her the proceeds of the two accounts.

The claim of the defendant bank, in essence, is that there was never any joint tenancy accounts set up or existing under the laws of the State of Kansas which would entitle the plaintiff to claim the legal title to the accounts, and that the claim of the plaintiff is essentially that of a gift to take effect at the death of the donor, which is ineffective and must fail because it was not made by last will and testament.

Subsequent to the filing of the action, the intervenor, Betty Jane Hartley, as Administratrix of the Estate of Vesta Crayton, Deceased, filed an answer in the cause, alleging that title to the two accounts is vested in and is the property of the Estate of Vesta Crayton, Deceased, to which the intervenor is entitled in her fiduciary capacity.

The Court finds, as a preliminary matter, that jurisdiction exists in this Court on the basis of diversity of citizenship between the plaintiff and the defendant and intervenor, and that the jurisdictional amount is in excess of $10,000.00.

The facts upon which this action is based, are as follows: The plaintiff, Lena F. Pace, was an intimate longtime friend of the decedent, Vesta Crayton, their acquaintanceship dating from the year 1916. This acquaintanceship and friendship between the parties was intermittent through the years until the decedent's death on May 22, 1964, but the evidence indicates a close and affectionate relationship between the parties and the fact that the decedent called upon the plaintiff to perform a number of duties which were highly trustworthy in their nature. The decedent, Vesta Crayton, a single woman after a divorce ending a childless marriage, had moved to California some time during the year 1935, and had acquired and purchased a piece of real estate which enhanced greatly in value from a relatively small investment to some $45,000.00, the sale price of the real estate at the time it was sold. The decedent was an elderly lady in poor health, had decided to move back to Kansas, and to sell the California real estate. In November, 1963, she did move back to Kansas and lived from that time until five days before her death with her brother, Burton Spears, at his home in Osawatomie, Kansas. Her health was not good during any of this time. At this time she requested her friend, the plaintiff, to go to California and supervise the sale of her real estate, and the plaintiff acceded to this request. The sale was finally consummated for the net sum of $42,021.70, which was paid in the form of a note and mortgage in the amount of $15,000.00, which was made payable to the decedent and sent to her, at plaintiff's direction, in care of the plaintiff at plaintiff's residence in Greenwood, Missouri. The balance of the purchase price of $27,021.70, was sent in the form of a check payable to the decedent, Vesta Crayton, and likewise was sent, at plaintiff's direction, to Vesta Crayton in care of the plaintiff at her home in Greenwood, Missouri.

Another fact which is alleged to be significant in this case is the fact that during the negotiation for the sale of the California real estate of the decedent, it became necessary for the plaintiff, Lena Pace, in order to adequately represent the decedent in California, to secure a power of attorney from Vesta Crayton. Such a power of attorney was made by Vesta Crayton to the plaintiff, dated February 11, 1964, which was broad in its terms, unrevoked by decedent prior to her death, and which is identified as Plaintiff's Exhibit 2.

*According to the testimony of the plaintiff,* the decedent was worried about the condition of her health and anticipated that it might be necessary for her to enter a hospital and undergo treatment or surgery for her physical ailments. Upon receipt of the check for the cash proceeds of the real estate sale, plaintiff went to Osawatomie to see Vesta Crayton, who was staying at her brother's house, and decedent instructed the plaintiff to go to the defendant bank and open two accounts in "both their names," one a checking account in the amount of $5,000.00, and one a savings account in the amount of $22,021.70. Thereafter, on the same day, plaintiff went to the bank, engaged in conversation with a Mr. Whiteford, an officer of the bank, exhibited the power of attorney, and advised Mr. Whiteford that she had been instructed by Vesta Crayton to set up two accounts in their joint names, so that either Vesta Crayton or the plaintiff could write checks on the accounts. Mr. Whiteford advised the plaintiff that it would be necessary for both Vesta Crayton and the plaintiff to sign a signature card, which was furnished by the bank as a part of its service to its customers. Accordingly, she was given a signature or "Depositor's Contract and Signature Card," which has been admitted into evidence as Plaintiff's Exhibit 1, and on which she procured the signature of the decedent, Vesta Crayton, and also placed her own signature upon the card in the designated place. Thereafter, plaintiff returned to the bank again, and on this occasion met with a Mr. Chambers, who was the cashier of the bank, and again the plaintiff advised Mr. Chambers how she wanted the accounts set up, in substantially the same words she had used earlier in her conversation with the bank's Mr. Whiteford.

Since, under the facts of this case, the execution and wording of the "Depositor's Contract and Signature Card" is so important, the card is hereinafter set forth in full, as follows:

| Depositor's Contract and Signature Card | Plf's Ex. 1 HP |
|---|---|
| Dated 5–1–64 | 10–29–64 |

The Bank is authorized to recognize any of the signatures subscribed below in payment of funds or the transaction of any business for this account.

HERE INSERT IN WRITING WHETHER ACCOUNT IS INDIVIDUAL; JOINT; PARTNERSHIP; OR CORPORATION _____

| Signatures | Vesta Crayton<br>1010 S. 5th<br>City | Signatures | Mrs. Lena F. Pace<br>Checking<br>Only |
|---|---|---|---|

## DEPOSITOR'S CONTRACT

"Items received for deposit or collection are accepted on the following terms and conditions. This Bank acts only as depositor's collecting agent and assumes no responsibility beyond its exercise of due care. All items are credited subject to final payment and to receipt of proceeds of final payment in cash or solvent credits by this Bank at its own office. This Bank may forward items to correspondents and shall not be liable for default or negligence of correspondents selected with due care nor for losses in transit, and each correspondent shall not be liable except for its own negligence. Items and their proceeds may be handled by any Federal Reserve bank in accordance with applicable Federal Reserve rules, and by this Bank or any correspondent, in accordance with any common bank usage, with any practice or procedure that a Federal Reserve bank may use or permit another bank to use, or with any other lawful means. This Bank may charge back, at any time prior to midnight on its business day next following the day of receipt, any item drawn on this Bank which is ascertained to be drawn against insufficient funds or otherwise not good or payable. An item received after this Bank's regular afternoon closing hour shall be deemed received the next business day."

STOP PAYMENT. In case this bank is ordered to stop payment on any item or items, the depositor agrees to hold the bank harmless for all expenses and costs incurred by the Bank on account of refusing payment of said item, and further agrees not to hold the Bank liable on account of payment contrary to this order if same occur through inadvertence, accident or oversight, or if by reason of such payment other items drawn by the depositor are returned insufficient. Order for stop payment is effective for six months, but renewals may be made from time to time. No stop payment order, renewal or revocation shall be valid unless in writing and delivered to the office of the bank.

SERVICE AND MAINTENANCE CHARGE. It is agreed that this account, whether active or dormant (an account shall be considered dormant when no deposit shall have been made or checks drawn or paid for a period of one year), shall be subject to service and maintenance charges heretofore adopted by this Bank and now in effect, and to such charges as may hereafter be adopted by this Bank. New service and maintenance charges and changes in existing charges shall become effective upon the posting of notice in the office of the Bank for a period of ten days or the publication thereof in any local newspaper before the end of said period, or upon giving the depositor not less than ten days' notice in writing mailed to the last address known to the Bank. Such charges may be deducted from the depositor's account and the Bank shall not be liable for dishonoring checks, drafts, notes, acceptances or other instruments because of insufficient funds resulting from the deduction of such charges.

JOINT ACCOUNTS. Joint depositors hereby agree each with the other and with the above Bank that all sums now on deposit or hereafter deposited by either or both of said joint depositors with said Bank to their credit as such joint depositors, with all accumulations thereon, are and shall be owned by them jointly, with right of survivorship, and be subject to the check or receipt of either of them or the survivor of them, and payment to or on the check of either or the survivor shall be valid and discharge said bank from liability. Each joint depositor hereby appoints the other attorney, with power to deposit in said joint account moneys of the other, and for that purpose to endorse any check, draft, note or other instrument payable to the order of the other or both of said joint depositors. Payment to or on check of the survivor shall be subject to the laws relating to inheritance and succession taxes and all rules and regulations made pursuant thereto. The rights or authority of the bank under this agreement shall not be changed or terminated

by said depositors or either of them except by written notice to said bank which shall not affect transactions theretofore made.

PARTNERSHIP ACCOUNTS. The members of the partnership named hereon hereby agree with each other and with said bank that any one or more of said partners shall at all times have full and complete authority to act for said partnership and for each and all of said partners in all partnership transactions of any kind or nature whatsoever with said bank. The signature of any one of said partners shall be sufficient to bind said partnership and all the other partners.

CORPORATION ACCOUNTS. The corporation, and each and all of its officers, agents and employees whose sig-

natures appear hereon, hereby represent to said bank that said corporation is duly and legally authorized to transact business, and that each of its officers, agents and employees whose signatures appear hereon, are now duly authorized by said corporation to represent and act for said corporation in all its transactions with said bank. Said corporation further agrees to promptly notify said bank in writing of any change in their authority to so act.

MAILING STATEMENTS. The bank is authorized to mail statements and cancelled checks to the last address known to the bank.

The terms of the above contract have been read and are hereby agreed to by owner of account.

(Sgd) Vesta Crayton

(Sgd) Lena F. Pace

———◆———

As a part of the transaction of the acceptance of the Depositor's Contract and Signature Card by the bank, the plaintiff was given a duplicate deposit slip for collection of $27,022.70, which was entered in evidence as Plaintiff's Exhibit 3. Later, on May 6, 1964, the bank issued a deposit slip (Plaintiff's Exhibit 7) on the checking account for $5,000.00, and a savings account book (Plaintiff's Exhibit 4) showing a deposit of $22,021.70, entitled "Vesta Crayton or Lena F. Pace." Bank ledger sheets were set up in the bank on the same day with identical entitlings, entered in evidence as Plaintiff's Exhibit 6 on the savings account, and Plaintiff's Exhibit 5 on the checking account.

On the night of May 17th, immediately preceding the entrance of the decedent into the hospital on May 18th, and at the home of the plaintiff, the decedent and plaintiff had a conversation in which they talked about Vesta Crayton's approaching surgery and hospitalization, during which conversation the decedent handed the bank book and the deposit slip, reflecting the two bank accounts, to

the plaintiff, saying, "Lena, these are yours," to which the plaintiff replied, "What do you mean?" The decedent replied, "In case I don't go through with the surgery all right, everything don't work out all right, it is yours to do as you please with." On May 18, 1964, the decedent, Vesta Crayton, entered a hospital in Kansas City, Missouri for surgery. The decedent died soon thereafter, on the 22nd day of May, 1964. The evidence indicates that there were no other deposits in the two accounts in question, nor were there any withdrawals or checks written on the accounts prior to the death of the decedent.

A short time after the death of the decedent, plaintiff appeared at the defendant bank to withdraw some funds from the checking account for the stated purpose "to pay the funeral director," at which time she was informed by the bank that no checks would be honored on the accounts because "it was in probate court." Thereafter, upon the advice of counsel, the plaintiff wrote two checks, one for the entire proceeds of the checking account in the amount of $5,000.00,

and one for the proceeds of the savings account in the amount of $22,021.70. The defendant bank refused to honor these checks, and the present legal action was begun.

■ In reaching a conclusion as to the legal title of the accounts in question, it is necessary to consider the legal effect of the number of legal documents upon which the plaintiff bases her claim. One of these documents is the power of attorney, which she was given by the decedent to effect the sale of the real estate and which the plaintiff exhibited to the officer of the defendant bank. Certainly, this power of attorney was important to give the plaintiff authority, or color of authority, to write checks upon the accounts, since under its provisions, as long as the decedent lived she would have been entitled to write checks on the accounts under her signature alone. However, the law of Kansas, which is in accord with the general principle of law nationwide, is that a power of attorney terminates at the death of the maker or principal. See 3 Am.Jur., Agency, § 52; A.L.I., Restatement of the Law, Agency, § 120; 2 C.J.S. Agency § 86. Consequently, this power of attorney, never having been exercised as to either of the bank accounts prior to the death of the decedent, Vesta Crayton, terminated and was voided by the death of Vesta Crayton. The importance of the power of attorney, if any, would be only as a fact or circumstance to show the nature or type of bank accounts which the parties intended to set up, and which the officers of the bank might have understood was intended to be set up.

In this case, the plaintiff strongly urges that there were valid joint tenancy accounts set up with rights of survivorship, effective under K.S.A. § 58–501. Attorneys for all of the parties in this matter vigorously contend and rely upon the case of Simonich, Executrix, v. Wilt, 197 Kan. 417, 417 P.2d 139, which sets out in very lucid and accurate fashion the requirements necessary for setting up a valid joint tenancy bank account. It is the contention of the plaintiff here that the language used sets up a valid joint tenancy account. It is the contention of the defendant bank and the intervenor administratrix that such language plainly does not set up such a valid and legal joint tenancy account. Both sides assert the validity of the parol evidence rule barring testimony to alter or explain the writings involved on the signature card, deposit slip and ledger sheets.

■ As stated in the Simonich opinion, which is a correct statement of the historical law on the subject in Kansas:

"It must be conceded under K.S.A. § 58–501, that a grant of personal property to two or more persons creates in them a tenancy in common with respect to such property, unless the language used in such grant makes it clear that a joint tenancy was intended to be created."

Let us therefore look at the language and format of Plaintiff's Exhibit 1, being the "Depositor's Contract and Signature Card." It should first be noted that the depositor's contract, among its pertinent provisions, has separate paragraphs concerning "Joint Accounts," "Partnership Accounts," and "Corporation Accounts." However, the language alone describing the duties, obligations, and representations for any of such type account is not in itself helpful here to determine the type of depositor's contract. Looking at the face of the card there is shown the handwritten date of 5–1–64, followed by the printed statement:

"The bank is authorized to recognize any of the signatures prescribed below in payment of funds or the transaction of any business for this account. Here insert in writing whether an account is individual; joint; partnership; or corporation ."

which is followed, as illustrated above, by a blank space in which the proper legal designation of the account is to be made. It is noteworthy that the face of Plaintiff's Exhibit 1 is blank as to any indication of what kind of account was to be set up by the parties. The front of the

card then shows the name and address of Vesta Crayton and Mrs. Lena F. Pace, and the back of the card contains their legal signatures. Looking at the legal effect of this card as the written contract which must determine the rights of the parties, it is possible from the wording and insertions on Plaintiff's Exhibit 1 to conclude that the account might be individual, with authorization of the plaintiff Lena Pace to draw on the account under and by virtue of the power of attorney which she held from the decedent; as joint, if in fact a joint tenancy account was to be set up; or it is possible that the account could conceivably cover a partnership, where either partner could write checks upon the account. Hence, we are forced inevitably to the conclusion that the face and content of the card does not show unambiguously a joint tenancy account, under which the plaintiff Lena F. Pace would have succeeded to the legal title of the proceeds thereof.

■ If, in fact, the contract itself establishes no title in the plaintiff as a joint tenant, are her rights improved by resort to parol evidence to explain the intention of the parties as to the legal purpose of the accounts? As the Court said in the Simonich case, supra, at page 423:

> "This court has frequently held that it is a judicial function to interpret a written contract which is free from ambiguity and does not require oral testimony to determine its meaning. Ambiguity in a written instrument does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. (Klema v. Soukup, 175 Kan. 775, 267 P.2d 501.) If a written contract is actually ambiguous concerning a specific matter in the agreement, facts and circumstances existing prior to and contemporaneously with its execution are competent to clarify the intent and purpose of the contract in that regard, but not for the purpose of varying and nullifying its clear and positive provisions. (Maltby v. Sum-

ner, 169 Kan. 417, 219 P.2d 395; and Oliver v. Nugen, 180 Kan. 823, 308 P.2d 132.)

> "If, in a case such as this, it becomes necessary to go beyond the written evidence of such grant or contract creating the account to establish the intention of the grantor, the inquiry should be confined to the time the contract was entered into, without reference to subsequent events or circumstances, since it is only the intention of the grantor at the time of the creation of such account that is material. (See, Brewer v. Schammerhorn, 183 Kan. 739, 332 P.2d 526.)"

We think the plaintiff's own testimony, as well as all the facts and circumstances, definitely negative the establishment of a joint tenancy account.

■ The most important single factor in establishing a valid joint tenancy is the clarity with which the intent of the grantor is expressed at the time the transaction is initiated. The rule of law in Kansas was correctly stated in the case of Miller v. Higgins, 188 Kan. 736, 366 P.2d 257, in which it is stated:

> "Regardless of the theory upon which the joint tenancy is sought to be established it ultimately will be resolved on the clarity with which the intent of the grantor is expressed. The intent of the grantor is basic and is derived clearly from the facts and circumstances of each case."

In the case at bar, as has been said, the naked words of the writings involved *do not* import the creation of a joint tenancy, and we think that the meaning of the words or actions necessary to make a valid joint tenancy here is completely rebutted by the facts and circumstances evidencing intent, both at the inception of the accounts and at such times precedent and subsequent thereto as are pertinent.

The testimony in the case is contradictory between that of Mr. Spears, the brother of the decedent, who testified that the decedent directed the plaintiff to take the check to the bank and deposit

it in the plaintiff's name, and the testimony of the plaintiff herself, whose testimony is that the direction of the decedent was to take the check to the bank and establish accounts in both their names. Clearly, from the testimony of the plaintiff herself, and giving it the most favorable inference, the record does not disclose an intention or direction from the decedent as the owner of the accounts or the potential grantor to set up joint tenancy accounts, or for that matter, any type of account, in which it was intended that the plaintiff have a property right. In cross-examination by Mr. McQueary, attorney for the intervenor, the following examination took place:

"Q. When you told her—when she told you to take the check, what were her exact instructions to you?

A. She told me, 'Lena, you and John take this down to the First National Bank and deposit it in your name and mine.'

\* \* \* \* \* \*

"Q. Now, did you and Mrs. Crayton have any other conversation at the time concerning the deposit of of this check?

A. No, we did not."

In this connection, also, the conversation of the plaintiff with Mr. Whiteford, at the bank, is illuminating on what the intention of the plaintiff herself was at the time of establishing the accounts:

"Q. What did you tell him that you wanted to do with the check?

A. I told him I wanted to put it in the bank in her name, Vesta Crayton, or me, Lena Pace.

Q. So, you told Mr. Whiteford you wanted to put this check in the bank in the name of Vesta Crayton or Lena Pace?

A. Lena Pace, and I want $5,000 in checking, and the remainder in savings.

Q. So, he did accept the check?

A. Yes, he did.

Q. And, that was the time he gave you this signature card, this Plaintiff's Exhibit 1?

A. Yes.

Q. Had you signed it?

A. I hadn't yet. I did sign it. He had me sign it in the bank.

Q. Did he fill out the card? Directing your attention to Plaintiff's Exhibit 1, did Mr. Whiteford fill out this card at that time?

A. Yes, I think he did.

Q. He had you sign it?

A. Yes.

Q. Then, did he tell you he would have to have the signature of Vesta Crayton?

A. Yes.

Q. So you took the card and left the bank, and you went down to Vesta Crayton's?

A. He marked it where he told me to have her sign it. You can see where he marked it. He marked it and told me to have her sign it.

Q. And, Vesta Crayton did sign it?

A. She did.

Q. Did you explain to Mr. Whiteford that you had Vesta Crayton's power of attorney?

A. Yes, I did. I showed it to him.

Q. Did he look at it?

A. He did.

Q. Did you tell him why you had it?

A. I did.

Q. What did you tell him?

A. I told him I had to have it to sell the property.

Q. Did you tell him you had to have it for any other reason?

A. No.

Q. Did you tell him you had to have it so you could handle the bank account?

A. No, I didn't.

Q. What was your reason for showing him the power of attorney?

A. I showed it all the way through. So, I showed it to him to put the money in the bank, and I showed it to him.

Q. You wanted Mr. Whiteford to know that you were acting as agent for Vesta Crayton?

A. That is true.

Q. So, after you had Vesta Crayton sign this signature card, you returned it to the bank?

A. I did.

Q. And, Mr. Whiteford wasn't there?

A. No.

Q. So, you talked to a Mr. Chambers?

A. That is true.

\* \* \* \* \* \*

Q. And what did you tell Mr. Chambers?

A. I told him that I wanted to deposit it in the bank.

Q. You told him how you wanted it deposited?

A. Yes, I did.

Q. Did you tell him you wanted it fixed so that you could write checks, to pay bills?

A. No, I didn't.

Q. You didn't say anything about that?

A. Nothing about checks.

Q. What did you tell him?

A. I told him I wanted it deposited in the bank in Vesta Crayton's name, or mine, and I wanted $5,000 in checking, and the remainder in savings.

Q. And, you told him substantially the same as you told Mr. Whiteford?

A. That is true, but nothing was said about checks.

Q. As a matter of fact, you gave him the identical language, words, that you gave to Mr. Whiteford?

A. That is true. But, I didn't say anything about checking at all. Nothing was said about checks. I told him I wanted to put $5,000 in the checking account, and the remainder in savings.

Q. So, then, he accepted the check?

A. That's right.

Q. And, gave you a deposit slip marked for collection?

A. That's true."

The transcript of plaintiff's testimony relative to the ownership of the $27,022.-00 at or about the time of the bank deposit, reflects the following question to and answer by the plaintiff on cross-examination:

"Q. And, you did not at that time claim you had any right, title or interest to that money, did you?

A. No, I did not."

■ We think it is abundantly clear, therefore, that at the time of the establishment of the two accounts in the defendant bank, the plaintiff, Lena Pace, did not intend or contend that she had any claim of ownership of either account. The two bank officials, Whiteford and Chambers, did not understand or intend that either account be considered a joint account. There was no discussion of survivorship or succession of title to the proceeds of the accounts. The accounts were to be established in Vesta Crayton's name, with Lena Pace's name on the account solely for the purpose of facilitating the writing of checks to pay medical or doctor bills of Mrs. Crayton, and as stated above, the conversation by the plaintiff relative to her having a power of attorney and showing it to the officers of the bank, indicates that it was to show her authority in that manner or capacity as decedent's authorized agent. To construe the evidence in the most charitable manner to plaintiff, it would have to be said that the bank officials were confused as to what type of account was desired to be set up—the designation of the type of account was

left open by the bank and Mrs. Pace—either by mutual agreement or as a normal consequence of inaction. Significantly, there was never any conversation or communication between Vesta Crayton, the owner of the funds, and any person connected with the bank. So, it will be seen that the use of parol evidence in the form of plaintiff's own testimony does not lend credence to her present contention that joint tenancy accounts were intended or existed.

 Considering plaintiff's evidence in its most favorable light, can it be said that title to the proceeds of the accounts were established in the plaintiff by any other legal theory applicable to the facts before the Court? If the evidence is inadequate to establish joint tenancy accounts, does title to one-half of the accounts exist in plaintiff as a tenant in common under K.S.A. § 58–501? It is clear that the same evidence surrounding the institution of the accounts also negatives any claim of title or property right in the plaintiff *at that time*. It can be said that there was an attempt on the night of May 17th, as a result of conversation between the decedent and the plaintiff, to make a gift of the several accounts by handing the plaintiff the savings bank book and deposit slip on the checking account. The decedent's own words, "Lena, this is yours. In case something should happen to me this is yours. After all my bills are paid this is yours" can only describe a gift to the plaintiff upon the contingency of the donor's death. Had a joint tenancy account been created by the initial acts of the parties this act of delivering the bank book and deposit slip, with accompanying declarations, would be unnecessary. Therefore this declaration and conditional delivery of the bank book and deposit slip can only be construed as an attempt to make a disposition of property at decedent's death. Such is testamentary in character and can be valid only if conducted in the manner provided by statute for making a will. See Lowry v. Lowry 160 Kan. 11, 159 P.2d 411; In Re Estate of Smith, Deceased, 162 Kan. 215,

174 P.2d 1012; In Re Estate of Koellen, Deceased, 162 Kan. 395, 176 P.2d 544.

 Neither could there be a completed gift to the plaintiff on the night of May 17th, that is, a valid intervivos gift. To be a valid intervivos gift, present intention of the donor and delivery from the donor to the prospective donee must have been absolute and unconditional, vesting title immediately and permanently in such donee. See Hall v. Hall, 76 Kan. 806, 93 P. 177; Ariett v. Osage County Bank, 120 Kan. 286, 242 P. 1018; Saxon v. Linscott, 123 Kan. 374, 255 P. 50.

Again, the best proof of the lack of a valid gift of any type—causa mortis or intervivos—is supplied by plaintiff's own testimony:

"Q. Now, then, of course, you understood if she went to the hospital and got over it all right, and regained her health, then it was still hers?

A. Why sure. Yes, that is true.

Q. You did then understand that this was to be given to you only on the contingency of her death?

A. That is true.

And if she recovered, then it was still hers?

A. That's right."

The plaintiff has now furnished the Court with the late Kansas case of In the Matter of the Estate of Smith, Deceased; Smith, Appellant, v. Blubaugh, et al, Appellees, Kan., 427 P.2d 443, which opinion was filed May 13, 1967, no volume citation being yet available. The Court has carefully read this case in an attempt to find some legal point upon which the plaintiff might substantiate her claim. In that particular case the Court held a joint tenancy account was valid which was set up by the decedent owner of the funds and officers of the bank without the knowledge of the other cotenant and donee, who was the son of the decedent. The purpose of the account there was to allow the son to write checks on the account to pay his mother's hospital and medical bills, similar to the initial stated

purpose here. In that case the co-joint tenant-donee, the son, made a number of withdrawals before decedent's death to pay the decedent's medical expenses— at least establishing some use pattern of the proceeds of the account. Furthermore, in addition to the account having been established by direct conversation and actions between the owner of the funds and employees of the bank, the officers of the bank, in that case, testified that the manner in which the account was handled was consistent with "normal banking practices for a joint account." The surviving cotenant and donee there, as the son of the decedent, urged that there was a valid contract entered into between his mother, the decedent, and the bank, which created a joint tenancy with right of survivorship, wherein the son Floyd was a third party beneficiary. The Supreme Court there held that the signature card constituted a contract in writing between the decedent cotenant and the bank, and there was no serious contention made by the appellees that the language used was insufficient to create a joint tenancy with right of survivorship. The Court there said that the fact that the surviving joint tenant son had no agreement with the decedent, and did not appear with her when the account was established, was of no real consequence, and that the legal significance of the contract entered into by the decedent cotenant and the bank, was the creation of a joint tenancy savings account with right of survivorship, wherein the son was a third party donee beneficiary, whose acceptance of his mother's largess might be presumed. In the case there, the Supreme Court of Kansas said that the surviving son cotenant's subsequent signing of the signature card, while perhaps required by the bank for its protection in the event of withdrawals by him from the bank, added nothing to the validity or enforceability of the contract by him as a third party beneficiary.

The controlling difference, however, between the Smith v. Blubaugh, supra, case, urged on this Court by the plaintiff, apparently to establish the third party beneficiary theory of title, on behalf of the plaintiff, is that in the case at bar, all of the actions concerning the setting up of the accounts were between the bank and the prospective joint tenant-donee —not between the prospective joint tenant-donor and the bank. The donor-owner of the account and the bank could make a good third party beneficiary contract vesting title in the third party as survivor, but it would be impossible for the non-titleholder donee to make a contract with the bank making herself a third party beneficiary and vesting title in her as survivor, when the donor-owner and the bank never had any conversation or relations with each other. Here, again, on this theory, as has been hereinbefore stated, as to the parol evidence which the plaintiff claims shows a joint tenancy account, even the plaintiff's own testimony refutes her claim. Likewise, all the facts and circumstances before the Court, including the way the remittances were made from the proceeds of the sale of the property in California to the decedent *in care of the plaintiff*, the movement by the plaintiff of the decedent from the home where decedent had been staying with her brother to plaintiff's own house five days before the decedent's death, the conversation in the plaintiff's house between the plaintiff and the decedent, the conversation between the plaintiff and the bank officials, and the non-use of the accounts for any purpose prior to the decedent's death, are facts and circumstances which redound against the validity of the plaintiff's claim. Under such facts and circumstances, the naked signature alone of the decedent, and her direction to take the check to the bank and deposit it in both their names, is not enough to vest any title in the plaintiff.

It is the Court's conclusion, therefore, that the plaintiff has no claim to either of the bank accounts on any evidence or legal theory presented by the plaintiff; that the title to the accounts passed at the death of the decedent to her estate, here represented by the defendant administratrix, Betty Jane

Hartley, and that the bank has no liability whatsoever to the plaintiff—its only legal obligation being to pay over these assets to the Estate of Vesta Crayton, Deceased, presently pending in the Probate Court of Miami County, Kansas.

The above and foregoing opinion is intended by the Court to incorporate findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Judgment will be entered in favor of the defendant and the intervenor against the plaintiff, with costs assessed to the plaintiff. Counsel will prepare and submit an appropriate journal entry of judgment in accordance with this opinion.